Jasper GRAMBY, Mel Raymond, Donald Evans, on behalf of themselves and all others similarly situated

v.

WESTINGHOUSE ELECTRIC CORPORATION and Westinghouse Salaried Employees Association, (WSEA).

Civ. A. No. 78–2316.

United States District Court,
E. D. Pennsylvania.

Dec. 6, 1979.

Alan M. Lerner, Faye R. Cohen, Manya L. Kamerling, Cohen, Shapiro, Polisher, Shiekman & Cohen, and Philip S. Fuoco, Philadelphia, Pa., for plaintiffs.

Melvin A. Schwarz, Robert Landis, Dechert, Price & Rhoads, Philadelphia, Pa., for Western Elec. Corp.

Max W. Gibbs, Sand, Gibbs, Marcu & Smilk, Upper Darby, Pa., for Salary Emp. Ass'n.

## MEMORANDUM

CLIFFORD SCOTT GREEN, District Judge.

Plaintiffs commenced this race discrimination action on July 11, 1978, challenging the employment policies and practices of Westinghouse Electric Corporation (hereinafter "Westinghouse") and Westinghouse Salary Employees Association (hereinafter "WSEA"). Plaintiffs are three black individuals, Jasper Gramby, Mel Raymond and Donald Evans, all of whom were or are employed by defendant Westinghouse and members of defendant-union WSEA. Their complaint asserts claims under: Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended; the Civil Rights Acts of 1866 and 1870, 42 U.S.C. § 1981; the Civil Rights Acts of 1861, 42 U.S.C. §§ 1985(3) and 1986; the Labor Management Relations Act of 1947, 29 U.S.C. § 158; the thirteenth amendment to the Constitution of the United States; and Article I, § 17, of the Constitution of the Commonwealth of Pennsylvania. Jurisdiction of this Court is alleged pursuant to 28 U.S.C. §§ 1331, 1343, 2201 and 2202; 42 U.S.C. §§ 1981, 1988 and 2000e; and the Constitution of the United States.

Pursuant to Fed.R.Civ.P. 23(b)(2), plaintiffs now move for certification of a class consisting of: (1) all past and present professional and semi-professional salaried nonexempt black employees of Westinghouse Electric Corporation Steam Turbine Division; and (2) all past, present and future black applicants for professional and semi-professional salaried, non-exempt employment with Westinghouse Electric Corporation, Steam Turbine Division.

For the reasons stated below, we grant plaintiffs' motion subject to the following limitations: the geographical scope of the class will be restricted to the Westinghouse plant in Lester, Pennsylvania; only salaried, non-exempt black employees and applicants for employment in Unit "C" of WSEA will be included in the class; and the class will be limited by the pertinent statutes of limitations to those persons whose section 1981 claims arose on or after January 20, 1970 and whose Title VII claims arose on or after May 18, 1973.

### I. FACTUAL BACKGROUND

Westinghouse is a major industrial corporation engaged in the production of household and commercial goods. Plaintiffs contest the employment practices of the Power Generations Group, a section of the company that manufactures and markets steam turbines used in power generation systems. Prior to August, 1978, the Group was organized as the Westinghouse Steam Turbine Division. In a corporate reshuffling, Westinghouse separated the marketing, operations and technical functions of the Division and designated the new alignment a

"Group". This transformation occurred after plaintiffs filed their complaint, but it appears not to have altered any relevant personnel policies and practices.

The Group once was comprised of four production plants, one each in Lester, Pennsylvania, Charlotte, North Carolina, Winston-Salem, North Carolina and Orange, California. As of November 1, 1978, the Orange facility was sold to an unrelated company, so it is no longer owned or controlled by Westinghouse.

The remaining three plants have been beset by litigation. *See In re Westinghouse Electric Corporation Employment Discrimination Litigation,* 438 F.Supp. 937 (Jud.Pan. Mult.Lit. 1977). A black woman has filed a class action on behalf of all black applicants and employees at the Winston-Salem facility, alleging both racial and sexual discrimination. *Warren v. Westinghouse Electric Corp.,* Civil Action No. C77–57–WS (M.D.N.C.). Similarly, the Equal Employment Opportunity Commission (hereinafter "EEOC") has filed an action on behalf of employees at the Charlotte and Winston-Salem facilities, charging Westinghouse with racial and religious discrimination *Equal Employment Opportunity Commission v. Westinghouse Electric Corp.,* Civil Action No. C77–174–WS (M.D.N.C.). Class certification has been denied in the EEOC lawsuit, but plaintiff's request for class action status in *Warren* has been stayed pending resolution of the individual claims in *EEOC.*

Finally and most significantly, four black hourly production and maintenance workers at the Lester facility have filed a class action on behalf of *all* black employees and applicants for employment in the former Steam Turbine Division, alleging a pattern and practice of racial discrimination extending throughout all four plants.[1] *Webb v. Westinghouse Electric Corp.,* Civil Action No. 76–172 (E.D.Pa.). Though Judge Huy-

ett granted class certification in that action, he restricted the geographical scope of the class to the Lester facility, and he permitted the plaintiffs to represent only the hourly employees, who were members of United Electrical Workers Local 107. *Webb v. Westinghouse Electric Corp.,* 78 F.R.D. 645 (E.D.Pa.1978). Salaried employees, who are members of defendant-union WSEA, were expressly excluded from the class. *Id.,* at 651–52.

The decision in *Webb* indirectly spawned this lawsuit, for shortly thereafter the three named plaintiffs—all of whom were black salaried, non-exempt[2] employees at the Lester plant—filed the instant complaint. They allege on behalf of the class that Westinghouse discriminated against black persons in the former Steam Turbine Division in recruitment, hiring, training, promotion, salary and all other conditions of employment.

Though the class claims span fifteen categories of allegedly discriminatory acts, the named plaintiffs' individual grievances primarily concern salary, promotions and access to overtime pay. Plaintiff Gramby began work at Westinghouse in July, 1973 as a File Clerk, Labor Grade 4. In November, 1975, he was promoted to a Computer Operator, Jr. (tape librarian), Labor Grade 8, without any concomitant increase in pay. Mr. Gramby alleges that he complained about this omission to both the management and WSEA, but nothing was done. Several months later, he claims, he discovered that white employees hired subsequently as file clerks were earning a higher salary than he had earned as either a file clerk or a Grade 8 tape librarian. After complaining to management once again, Mr. Gramby received a raise in March, 1976. He alleges that this increment still fell short of his entitlement.

---

1. Two additional suits have been filed with respect to the Lester plant, but these are individual actions, *Rivers v. Westinghouse Electric Corp.,* 451 F.Supp. 44 (E.D.Pa.); *Bradford v. Westinghouse Electric Corp.,* Civil Action No. 77–655 (E.D.Pa.).

2. Non-exempt employees consist mainly of technical and clerical personnel who by law must receive overtime compensation. See generally, 29 U.S.C. § 201 et seq. Exempt employees are professional and administrative personnel who are not required to be paid overtime compensation.

On April 8, 1976, Westinghouse notified plaintiff Gramby that he would be laid off. Again, Mr. Gramby protested to defendant WSEA, but nothing was accomplished. Mr. Gramby now maintains that had he been promoted to the level of a Grade 11 computer operator, he would have been impervious to the lay-off. Because of racial animus, however, Westinghouse refused to advance him, he charges, and instead the company hired persons from outside Westinghouse to fill vacancies in those positions.

On May 5, 1976, plaintiff Gramby filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), naming as defendants both Westinghouse and WSEA. On June 9, 1978, the agency issued to him a Notice of Right to Sue.

Plaintiff Mel Raymond's allegations of race discrimination concern the terms and conditions of his employment at the Lester plant. Mr. Raymond entered salaried employee status in 1964, when he was assigned to the programming department at Lester. Apparently in that department, the availability of overtime work and the degree of skills acquired vary with the type of machine . to which an employee is assigned. Responsibility for maintaining an equitable distribution of overtime work rests with defendant WSEA.

Plaintiff Raymond alleges that he received job assignments inferior to white workers of equal or less skill and seniority than he, and that, consequently, he was denied equal access to overtime pay and equal opportunity to be promoted to better programming positions. He maintains that he consistently complained about this unequal treatment to WSEA and to Westinghouse management. On April 25, 1977, plaintiff Raymond filed a charge of racial discrimination with the EEOC, naming as a defendant Westinghouse and identifying as a party to the illegality WSEA. The EEOC

issued a Notice of Right to Sue on June 9, 1978. Subsequently, in January, 1979, Mr. Raymond was laid-off from his employment at the Lester plant.

The third and final named plaintiff in this action is Donald Evans. Mr. Evans was hired by Westinghouse as an hourly employee in 1965 and became a member of WSEA Unit "C" in 1973 so he could participate in the computer progression line. Initially a File Clerk Senior, Labor Grade 4, he was promoted, as was plaintiff Gramby, to Computer Operator Junior, Labor Grade 8. That promotion occurred on May 20, 1974. On April 28, 1975, plaintiff Evans again was promoted, this time to the position of Computer Operator, Labor Grade 11. During the latter part of 1975, Westinghouse reorganized Mr. Evans' department, and it was decided that employees in Labor Grade 11 would remain whereas employees in Labor Grade 8 and 4 would be laid off. Plaintiff Evans alleges that he was involuntarily downgraded to his former Labor Grade 8 position and that his allegedly unsatisfactory job performance in the higher position was an excuse proffered by Westinghouse to mask racial discrimination. Mr. Evans attempted to complain to defendant WSEA about his demotion, but he was unable to contact Ed Miller, president of the union. Plaintiff also alleges that he made numerous bids for better jobs between 1967 and 1974, but was never told why he did not receive them.

On July 20, 1976, plaintiff Evans filed a charge of racial discrimination with the EEOC, naming as a defendant only Westinghouse. Thereafter, the agency issued a Notice of Right to Sue on March 2, 1977, and within ninety days of its receipt he filed the Notice with the Clerk of the United States District Court. He did not file a formal complaint until July 11, 1978.[3]

---

3. Defendants have argued that plaintiff Evans' Title VII claim is time-barred by his failure to file a formal complaint within ninety days of receipt of his Notice of Right to Sue. See 42 U.S.C. § 2000e–5(f)(1). Even if the Court accepted this argument, class certification would

remain appropriate, for it is well settled that not every class representative must have fulfilled the jurisdictional filing requirements · of Title VII. *Webb*, 78 F.R.D. at 649 n. 1; *Schoeppner v. General Tel. Co. of Pa.*, 417 F.Supp. 453 (W.D.Pa.1976).

## II. CLASS CERTIFICATION UNDER RULE 23

■ It is well settled that a party moving for class certification bears the burden of establishing that all four requisites of Rule 23(a) are met, as well as demonstrating that the class he seeks to represent falls within one of the categories of Rule 23(b). *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239 (3d Cir. 1975), *cert. denied* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *Davis v. Romney,* 490 F.2d 1360, 1366 (3d Cir. 1975). In condensed form, the requirements of Rule 23(a) are: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.[4] Plaintiffs seek to invoke subdivision (2) of Rule 23(b), which provides that a class action may be maintained if "the party opposing the class has acted . . . on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . . ."

Defendants offer a panoply of arguments to show that plaintiffs have not met their burden. We now address those arguments.

### A. GEOGRAPHICAL SCOPE

■ Most of the dispute centers on the commonality and typicality requirements of Rule 23(a). Plaintiffs seek to represent a multiplant class encompassing employees and rejected applicants from all four facilities in Westinghouse's former Steam Turbine Division. Defendants argue that if any class is appropriate, it should be restricted geographically to the Lester plant, where all three named plaintiffs were employed. Moreover, defendants argue that plaintiffs' claims are so unique and particularized that no class should be certified.

The prevailing view in this judicial district is that a Title VII plaintiff may represent a class including all persons affected by an employer's allegedly discriminatory practices, even though that plaintiff has been adversely affected by only one such practice and in only one department of the company. *See, e. g., Wajda v. Penn Mutual Life Insurance Co.,* 80 F.R.D. 303 (E.D.Pa. 1978); *Black Grievance Comm. v. Philadelphia Electric Co.,* 79 F.R.D. 98 (E.D.Pa. 1978); *Hannigan v. Aydin Corp.,* 76 F.R.D. 502 (E.D.Pa.1977). Appropriately named the "across-the-board" approach, this view finds the commonality and typicality requirements of Rule 23(a) satisfied in recognition that race discrimination is by its very nature a classwide question.

We believe the across-the-board approach negates defendants' objections to certification of a single-plant Lester class. Defendants have not identified, and we cannot find, any specific aspect of plaintiffs' claims which would brand the claims as being unique and particularized. See generally, *Martin v. Easton Publishing Co.,* 73 F.R.D. 678 (E.D.Pa.1977). Rather, defendants rely on the fact that plaintiffs' claims involve particular supervisors at the Lester plant and some, but not all, of Westinghouse's allegedly discriminatory practices.

The allegations of the complaint have one central, unifying theme, that plaintiffs and the class were adversely affected by employment decisions based on race. It is precisely this sort of claim which the across-the-board approach recognizes. *Wajda,* 80 F.R.D. 303, 307; *Hannigan,* 76 F.R.D. 502, 507–08. Accordingly, we conclude that plaintiffs' claims are common to and typical of the claims of other black salaried, nonexempt employees at the Lester plant.

As to the asserted multiplant class, we reach a different conclusion. Although courts have applied the across-the-board approach on a multiplant basis, they have insisted upon a showing of factual nexus between the claims of the named plaintiffs and the claims of the geographically dis-

---

4. Rule 23(a) provides:

    (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

persed class members. See, e. g., *Webb,* 78 F.R.D. 645, 651; *Hannigan,* 76 F.R.D. 505, 510; *Droughn v. FMC Corp.,* 74 F.R.D. 639, 642–43 (E.D.Pa.1977).

Plaintiffs have made allegations concerning the requisite nexus, but they have stated no facts demonstrating its existence. In their complaint, plaintiffs broadly averred that Westinghouse maintained fifteen discriminatory policies applicable to employees at all four Steam Turbine Division plants. After class-oriented discovery, however, plaintiffs have not identified any specific policy which was universally applied. Similarly, plaintiffs have asserted that Westinghouse's corporate headquarters in Pittsburgh exercised centralized control over the personnel departments at each of the plants. Yet the evidence adduced by plaintiffs—organizational charts, standardized forms, corporate manuals and the like—shows centralized control over routine personnel matters, such as leave, holidays and Social Security, but not over the employment decision-making of which plaintiffs complain. According to affidavits submitted by defendants, the latter type of control is exercised locally and autonomously by management at each plant; they determine whom to hire, the level of compensation and the pace of promotion. On the basis of this factual record, we find unsupported plaintiffs' allegations of common control of the relevant employment practices at the four Steam Turbine Division plants.[5]

Also, we note that the Lester plant is the only unionized facility in the Power Generations Group. Additionally, there is no evidence of interplant movement of salaried, non-exempt employees among the four facilities. These facts buttress our conclusion that plaintiffs have not shown a sufficient nexus with employees at other plants in the Power Generations Group to represent a multiplant class. Therefore, the proposed class will be restricted geographically to the Lester plant's black salaried, non-exempt employees and applicants for employment.

### B. JOB CLASSIFICATIONS

■ There remain for determination the precise contours of the single-plant class. In this regard, defendants object to the inclusion of professional, salaried black employees who are members of WSEA Unit "A."

As mentioned above, the named plaintiffs in this action are semi-professional employees who are members of WSEA Unit "C." Unlike the professionals, for whom a college degree is a prerequisite of membership, semi-professionals in Unit "C" are essentially technical and clerical personnel. Their unit has its own collective bargaining agreement.

The named plaintiffs have alleged no specific discriminatory acts which were directed at members of WSEA Unit "A." Nor can it be assumed, in view of the differences in education, job classification and collective bargaining agreements, that the named plaintiffs would be familiar with the grievances of the professionals and could adequately represent their interests. For these reasons, we will limit the proposed class to black salaried, non-exempt employees in bargaining Unit "C."

### C. APPLICANTS

■ Defendants next assail plaintiffs' attempt to represent unsuccessful black applicants for salaried, non-exempt positions at

---

**5.** Though made independently after consideration of the factual record *sub judice,* our finding parallels the earlier determinations of other courts. In *Webb,* Judge Huyett concluded that "[t]he complete autonomy of each plant with respect to personnel decision making prevents them from satisfying the commonality and typicality requirements of Rule 23(a)." *Webb,* 78 F.R.D. at 651. Similarly, in *In Re Westinghouse Electric Corporation Discrimination Litigation,* the Judicial Panel on Multidistrict Litigation said, in refusing to consolidate the various actions brought against the Steam Turbine Division, "[a]lthough we recognize that the allegations of racially discriminatory employment practices in these five actions may involve some common questions of fact, we are not persuaded that these common issues would predominate over individual factual issues." *In Re Westinghouse Electric Corp.,* 438 F.Supp. at 938.

Lester. Citing the recent decision of the Third Circuit Court of Appeals in *Scott v. University of Delaware,* 601 F.2d 76 (3d Cir. 1979), defendants contend that the named plaintiffs make no personal claim of discrimination in the hiring process and therefore lack the requisite commonality of interest with unsuccessful black applicants; furthermore, defendants argue that the named plaintiffs have an inherent conflict of interest with the proposed class of rejected applicants.

In *Scott,* a black former assistant professor at the University of Delaware brought suit against the University after it refused to renew his teaching contract. The district court certified a proposed class consisting of applicants seeking faculty positions and persons, like Scott, who had actually obtained faculty status. Scott appealed after the district court found against him on both his individual and class claims. On appeal, the court not only affirmed the judgment against Scott on his individual claims, but also held that the class should have been decertified when the facts developed at trial disclosed that the Rule 23(a) prerequisites were not satisfied.

Citing precedents in other judicial circuits, the Court of Appeals expressed doubt that one who has not been injured by any alleged discriminatory hiring practices may represent a class contesting those hiring practices. *Scott,* 601 F.2d at 87. Nevertheless, the court's holding was considerably more narrow. The court found a clear conflict of interest between Scott and the putative class of applicants.

Scott had predicated his individual claim for promotion and tenure, in large measure, upon his possession of a doctor of philosophy degree, while he alleged on behalf of the applicant class that a doctoral degree requirement was not job related and was discriminatory. The Court of Appeals said:

> He thus attacks, via the applicant class, the very degree which he possesses and which he asserts in his own favor in seeking relief on his individual disparate treatment claim. The assertion of these inconsistent positions necessarily forecloses any contention that Scott's claims are typical of the claims of those applying for faculty positions. Under these circumstances, it cannot be said that Scott was an adequate representative of the unnamed members of a class seeking employment. *Scott,* 601 F.2d at 86.

We interpret *Scott* as leaving unimpaired the decisions in this judicial circuit which have permitted plaintiffs whose personal claims involved discrimination only in promotions, salary or working conditions, to lead a class which included unsuccessful applicants for employment. See, e. g., *Webb,* 78 F.R.D. at 652. Moreover, plaintiffs do not concede, as defendant Westinghouse contends, that discriminatory hiring practices did not contribute to their allegedly inferior job classifications. Accordingly, we turn to defendants' alternative argument for excluding rejected job applicants, that there exists a conflict between their interests and those of the named plaintiffs.

The defendants base their assertion of a conflict on the deposition testimony of plaintiffs Gramby and Evans. In describing Westinghouse's alleged discrimination against them, these plaintiffs said that the company refused to promote them to the position of Computer Operator, Grade 11, and instead hired employees from outside the Lester work force. Mr. Evans recalled that one of these outside hires was a black man. Defendants reason that since plaintiffs Gramby and Evans attribute their lack of progress in promotion to the outside hiring, their interests are directly inimical to those of rejected applicants who applied for the very same jobs.

We disagree. In *Scott,* a clear conflict arose *after* the initial class certification because the plaintiff then asserted in his favor a position wholly at odds with the claims of the rejected applicants. By contrast, plaintiffs here invoke the same standards for themselves as they do for the unsuccessful black applicants.

Plaintiffs do not attribute their lack of progress to outside hiring; rather, they attribute it to unlawful discrimination. Far from being conflicting, their interests are

identical with those of the rejected applicants, for both groups assert the same legal right to nondiscriminatory treatment. Should a conflict appear at trial, we will then decertify this portion of the class, as *Scott* mandates. However, the conflict now asserted by defendants is more speculative than real and, accordingly, we will permit the named plaintiffs to represent unsuccessful black applicants for the semi-professional, salaried, non-exempt positions at the Lester plant.

## D. TIME

■ The final limitation on the plaintiff class is the statute of limitations, which forecloses the claims of some putative class members.

In *American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), the Supreme Court held that the timely commencement of a class action tolls the applicable statute of limitations for unnamed class members, even though the suit is later denied class action status after the statutory period has expired. *Id.*, at 553, 94 S.Ct. 756. The Court reasoned that if this rule were not applied, members of a purported class might be induced to intervene as a matter of self-protection where the statute of limitations would elapse and where a denial of class certification would require them to seek relief individually. This, in turn, would produce needless duplicative motions not in keeping with the objectives of the federal class action procedures.

As noted earlier, plaintiffs in this action were members of the proposed class in *Webb.* The EEOC charge filed by plaintiff Webb was sufficiently broad to trigger an investigation of their claims and, although the EEOC found no reasonable cause for Webb's charge of individual harassment, it did find cause that blacks at the Lester facility were denied promotions on the basis of race. *Webb,* 78 F.R.D. at 648. On February 1, 1978, Judge Huyett excluded plaintiffs from the class certified in *Webb* on the ground that their interests would be inadequately represented by the hourly employees. *Webb,* 78 F.R.D. at 651–52.

For the reasons articulated in *American Pipe,* we hold that the commencement of the *Webb* class action suspended the applicable statutes of limitations as to all members of the plaintiff class who would have been parties to the *Webb* action had not salaried, non-exempt employees been excluded from the class certified therein. *See, also, Haas v. Pittsburgh National Bank,* 526 F.2d 1083, 1096–98 (3d Cir. 1975). In short, we will borrow the cut-off dates established for the plaintiff class in *Webb.* These dates are May 18, 1973 for plaintiffs' Title VII claims and January 20, 1970 for plaintiffs' section 1981 claims. *Webb,* 78 F.R.D. at 653.

## E. RULE 23(b)(2)

■ Finally, defendant WSEA contends that this lawsuit should not be maintained as a class action under Rule 23(b)(2) because class action status is unnecessary to provide relief to the class. According to defendant WSEA, a declaratory or injunctive decree in favor of the named plaintiffs alone would redound to the benefit of all black employees without the complexities of a class action.

Having carefully scrutinized Rule 23(b)(2) and the Advisory Committee Notes Accompanying the 1966 Amendments to Rule 23, 39 F.R.D. 69 (1966), we find no warrant for imposition of this additional "need" requirement. Indeed, refusal to certify a class where a class action initially appears unnecessary may ultimately lead to disastrous consequences for the unrepresented class members. See Note, *The "Need Requirement": A Barrier to Class Actions Under Rule 23(b)(2),* 67 Georgetown L.J. 1211 (1979). For example, the claims of the named plaintiffs might be mooted or settled, thereby precluding all relief in favor of the class. Moreover, discovery and admissible evidence would be confined to individual rather than class claims, making uncertain, in fact, whether relief would flow to the class.

For these reasons, we will certify the class sought by plaintiffs under Rule

23(b)(2), subject to the restrictions set forth above.