Barbara **SEIDEL,** G. Mary Simmons, Barbara J. Osbjornsen, and Sharon G. Hudson, Plaintiffs,

v.

**GENERAL MOTORS ACCEPTANCE CORPORATION, a New York Corporation, Defendant.**

No. C77–514C.

United States District Court, W. D. Washington.

Dec. 23, 1981.

Mary Ann Ottinger, Hayne & Moote, Richard F. Krutch, Krutch, Lindell, Donnelly & Judkins, Seattle, Wash., for plaintiffs.

John F. Aslin, Richard Ottesen Prentke, Perkins, Coie, Stone, Olsen & Williams, Seattle, Wash., for defendant.

**ORDER ACCEPTING MAGISTRATE'S RECOMMENDATIONS AND DENYING CLASS CERTIFICATION**

COUGHENOUR, District Judge.

This case is before the Court on plaintiffs' motion for class certification. Plaintiffs, four present female employees of defendant General Motors Acceptance Corporation ("GMAC"), brought this action against their employer under the provisions of Title VII

of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Defendant, a subsidiary of General Motors Corporation, is one of the largest consumer financing organizations in the world. It has over 300 offices throughout the United States and more than 55 offices abroad. Plaintiffs allege "across the board" discrimination—that is, discrimination in hiring, promotion, job assignment, pay, and other incidents of employment.

*Introduction*

Plaintiffs seek an order determining that this case shall be maintained as a class action pursuant to the provisions of Rule 23(b)(2) and/or 23(b)(3) of the Federal Rules of Civil Procedure. The class of individuals which the named plaintiffs seek to represent include (1) all women presently employed by the defendant throughout the United States; (2) all women no longer employed by GMAC, but who were employed by GMAC within the United States on or before November 9, 1976; (3) all female applicants for employment with GMAC since May 13, 1976; and (4) all future female applicants for employment with, and employees of, GMAC throughout the United States. It is undisputed that plaintiffs' proposed class, if certified, would consist of some 14,700 past or present GMAC employees, or applicants for employment, at approximately 300 GMAC offices throughout the country. On September 9, 1980 United States Magistrate Philip K. Sweigert filed with the Court his report and recommendations on plaintiffs' motion to certify such a class. The magistrate recommended against certification on the grounds that the proposed class lacked the essential element of commonality sufficient to satisfy the requirements of Federal Rule of Civil Procedure 23(a)(2), and that such a class would be unmanageable. The Court agrees, and finds in addition other impediments to class certification. Plaintiffs' motion is, accordingly, DENIED.

The named plaintiffs have collectively worked in six separate branch offices of defendant GMAC, in a variety of job categories. They are not, however, members of four of the groups which they aspire to represent: (1) executive office personnel, (2) regional office personnel, (3) applicants who applied for but were denied employment, and (4) unclassified personnel. Defendant GMAC employs some 10,500 individuals throughout the United States alone; there exist approximately 32 job categories below the management level at GMAC, and at least five categories at the management level. Named plaintiffs allege that most women hired by GMAC are initially assigned to lower level positions than are men, and that they are less likely than men to receive promotions. The record with respect to the instant motion, in excess of two hundred pages of briefs alone, is replete with statistics provided in support and derogation of these allegations; each party, in turn, takes issue with the methodology and statistical bases employed by the other.

The Court is cognizant of the Ninth Circuit's adoption of the generally recognized view that class actions are particularly appropriate in employment discrimination cases. *Gay v. Waiters' & Dairy Lunchmen's Union*, 549 F.2d 1330 (9th Cir. 1977). However, such a view does not and should not suspend or otherwise alter the basic requirements of Federal Rule 23. Plaintiffs must still meet their affirmative burden of showing that the proposed class is an appropriate one for certification. *See, e.g., Doninger v. Pacific Northwest Bell, Inc.*, 564 F.2d 1304 (9th Cir. 1977); *EEOC v. Detroit Edison Company*, 515 F.2d 301 (6th Cir. 1975). This obligation is made all the more incumbent upon the District Courts by the Supreme Court's decision in *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977) (hereinafter *"East Texas Motor Freight"*). In that case the Supreme Court said that, although Title VII cases by their very nature involve class-wide wrongs, "careful attention to the requirements of [Federal Rule 23] remains nonetheless indispensable." *Id.*, at 405, 97 S.Ct. at 1897. The Ninth Circuit is in accord. Citing *East Texas Motor Freight*, the Circuit noted in *Doninger, supra*, at 1312:

Mere invocation of the language of Rule 23 in Title VII suits is no mystical legal

talisman guaranteeing class treatment .... Although most Title VII suits may satisfy Rule 23 requirements, there is no reason to allow class treatment if the prerequisites are not met.

The Court finds that in the instant case the prerequisites have not been met.

### Rule 23(a)—"Commonality"

It is undisputed that plaintiffs' proposed national class meets the numerosity requirement of Rule 23(a)(1); as noted above, there are in excess of 14,000 potential members of the proposed class. Rule 23(a)(2), which requires that there be questions of law or fact common to the class, presents a much greater problem for plaintiffs. Plaintiffs urge that *Harriss v. Pan American World Airways, Inc.*, 74 F.R.D. 24 (N.D.Cal. 1977), sets out the criteria which the Court must consider in reaching the issue of "commonality" in the context of litigation over allegedly unlawful employment practices. The criteria include the following: (1) the nature of the unlawful employment practice charged, i.e. whether it would affect only a few employees or the whole class; (2) the uniformity or diversity of the relevant employment practices, considering matters such as number of installations involved, size of the work force, degree of geographic dispersion of the employees concerned, and the degree of decentralization of administration and supervision as opposed to the degree of local autonomy; (3) the uniformity or diversity in the membership of the class, in terms of the likelihood that the members' treatment will involve common questions; and (4) the nature of the employer's management organization as it relates to the degree of centralization and uniformity of relevant employment and personnel policies and practices. *Id.*, at 41.

It is precisely these criteria which lead the Court to the conclusion that plaintiffs' proposed national class does not possess the requisite commonality to warrant certification. The record available to the Court, which consists in part of defendant's "Personnel Policy and Procedure Manual" and the affidavit of Virgil Smith, GMAC Vice President—Personnel Administration, shows that hiring, evaluation, pay, promotion and task assignments are the virtually-exclusive province of local branch management. An examination of the manual, for instance, indicates that recruitment is strictly a local function. Logic would dictate such a conclusion even if the personnel manual did not. GMAC maintains 269 branch offices, some rural, others urban, some in areas of rapid growth, others in areas of slower growth. Clearly, recruitment efforts must be locally and independently tailored to the needs of a particular office, and to the demographic and economic realities of a particular region. Likewise, the manual shows that individual branch offices retain the sole responsibility for hiring decisions, and that the branch manager exercises the independent authority to terminate employees within his or her office. Plaintiffs provide conspicuously little evidence to refute such indicia of local autonomy. Instead, they rely on statistical analyses which purport to show similar patterns and trends around the country, from which plaintiffs would have the Court infer that *"[s]urely* there must be a master plan." (Plaintiffs' Brief of August 31, 1979 at p. 18; emphasis in the original) To the contrary, the evidence before the Court suggests that in matters of critical relevance to this lawsuit, i.e. hiring and promotion, defendant's branch offices function independently of one another.

Of those decisions which have considered the multi-facility issue in the context of a Rule 23(a)(2) "commonality" analysis, the Court has found *Webb v. Westinghouse Electric Corporation*, 78 F.R.D. 645 (E.D.Pa. 1978), to be particularly useful. There, four black plaintiffs filed allegations challenging virtually every employment practice at Westinghouse's four STD (Steam Turbine Division) plants. All of the named plaintiffs worked at the same facility. In denying plaintiffs' motion for class certification of all blacks at all four plants, the court found the following obstacles created by the various differences within the class proposed by the plaintiffs: four different plants which controlled employment policies

at the local level, with no proof of centralized control; different union affiliations; and diverse job classifications. The court went on to find that these differences, when combined with the absence of any discernible policy or practice on a company or division-wide basis, was sufficient to negate the requisite finding of commonality:

> [T]he complete autonomy of each plant with respect to personnel decision making prevents them from satisfying the commonality and typicality requirements of Rule 23(a).

*Id.*, at 651. The court refused to allow the named plaintiffs to represent employees and applicants other than those at the plant at which the four were employed. The considerations inherent in the *Webb* court's analysis are present here; the salient difference is that in *Webb* there were four facilities at issue. Here there are 300.

Other courts which have addressed the question of whether named representatives in one location may represent class members employed in other locations have, at least since *East Texas Motor Freight*, reached substantially similar conclusions: without a showing of centralized control over employment decisions, such multi-facility representation does not satisfy the commonality requirement of Rule 23(a)(2). *See, e.g., Hill v. Western Electric Company*, 596 F.2d 99 (4th Cir. 1979); *Valentino v. U. S. Postal Service*, 17 E.P.D. ¶ 8590 (D.D.C. 1978); *Droughn v. FMC*, 74 F.R.D. 639 (E.D.Pa.1977). The cases which plaintiffs cite in support of multi-facility representation are, almost without exception, less complex than that before us here, and virtually all predate the stricter standards established in *East Texas Motor Freight*. Plaintiffs have recently suggested that "uniformity of practice," which they would have the Court infer from an alleged "uniformity of result" in the employment and promotion of women in defendant's branch offices, may, in the absence of a showing of centralized control, be enough to find the commonality required by Rule 23(a). Plaintiffs' papers are bereft of convincing authority for such a proposition and the Court is not persuaded that such a standard may

be arbitrarily substituted for centralized control in the multi-facility context. Even if plaintiffs' burden was that of showing a company-wide *practice* rather than a company-wide *policy*, as plaintiffs urge, the Court does not find statistical evidence of such a national practice in the record. Even if plaintiffs' statistics *did* suggest the existence of such a practice at GMAC, an action based on allegations of disparate treatment, such as this one, requires a showing of "discriminatory intent." *Piva v. Xerox Corporation*, 654 F.2d 591 (9th Cir. 1981); citing *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Golden v. Local 55, etc., Ass'n of Firefighters*, 633 F.2d 817 (9th Cir. 1980). There is no evidence before the Court which would suggest such intent.

For all the foregoing reasons, the Court finds that plaintiffs have not made the necessary showing of commonality to warrant the certification of this proposed national class.

*Rule 23(a)(4)—Fair Representation*

A further prerequisite to class action certification pursuant to Rule 23(a) is a showing that the named representatives will fairly and adequately protect the interests of the class. A class representative is an inadequate representative if he or she possesses interests which are antagonistic to those of the class. *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239 (3rd Cir. 1979). In *Dickerson v. United States Steel Corporation*, 22 F.R.Serv.2d 866 (E.D.Pa. 1976), the court concluded that present or discharged employees could not adequately represent the interests of unsuccessful job applicants. 22 F.R.Serv.2d at 868. The focus of the court there was on the holding of *Franks v. Bowman Transportation Co.*, 423 U.S. 814, 96 S.Ct. 25, 46 L.Ed.2d 32 (1976), to the effect that persons who are not hired because of discrimination are entitled to seniority from the date on which they would have been hired, absent the discrimination. Because this grant of retroactive seniority would place some rejected appli-

cants ahead of present employees in the contest for promotion or benefits, the court concluded that there was a conflict between the groups. 22 F.R.Serv.2d at 868. Although we do not find that such an antagonistic interest would *necessarily* result here, the Court is not unmindful of that possibility.

In considering the requirements of Rule 23(a)(4) the Court is more concerned with the question of whether the named plaintiffs would be truly "representative." All of the named plaintiffs are classified employees at various branch offices of GMAC. Absent from the record is evidence which would show that named plaintiffs possess the requisite degree of shared interest with executive and regional office personnel, with unclassified employees, and with applicants never hired. This Circuit has recently noted, in an adequacy of representation inquiry not unlike the present one, that it may be error to allow an actual employee to represent job applicants who are denied employment:

> The question whether Piva is a proper class representative is also not before us. We do note, however, that . . . Piva purported to represent women who allegedly suffered discrimination in that they were not hired by Xerox. Piva had been hired by Xerox and this is not the basis of her individual claim.

*Piva, supra,* 654 F.2d 594, at n.2.

The plaintiffs have also failed to identify any pervasive GMAC policy which would apply to all GMAC female employees, regardless of subclassification. In the absence of such a policy, and without cognizable evidence of shared interest with those disparate subclasses identified above, the Court believes that to appoint named plaintiffs as representatives of such a national class would contravene the letter and intent of *East Texas Motor Freight. See also Harriss v. Pan American World Airways, supra* (plaintiffs not representative because of wide dispersion of class, and broad range of employment conditions and class interests), and *Hill v. Western Electric, supra.* Accordingly, the Court finds that the

named plaintiffs have failed to meet their burden of showing that they would provide adequate representation to the proposed national class pursuant to Rule 23(a)(4).

*Manageability*

Although it is not specifically listed as a factor for consideration in Rule 23(b)(2) actions, as it is in Rule 23(b)(3) actions, manageability is and must be of fundamental concern in assessing adequacy of representation and the broader question of class certification in general. *See, e.g., Hill v. American Airlines, Inc.,* 479 F.2d 1057 (5th Cir. 1973) (a proposed national Rule 23(b)(2) class held to be "inappropriate and unmanageable"). *See also Karan v. Nabisco, Inc.,* 78 F.R.D. 388 (W.D.Pa.1978), where the court, in the context of a Rule 23(b)(2) action, noted that:

> Unmanageable cases may not only be a disservice to Title VII . . . but they may cause excessive delay in final resolution of the case, to the prejudice of all involved, and disrupt the judicial economy objectives of the class action device.

*Id.,* at 406.

Plaintiffs' proposals for management of the proposed national class are both vague and perfunctory. Plaintiffs briefly address the problems of identifying class members, and calculating damages for same, and posit the construction of a number of profiles to correspond to the various subclasses involved. They suggest the implementation of a formula for deriving eligible applicants and class members, and argue that there are a number of "imaginative," i.e. quasi-formula, methods available to assist the Court in the calculation of damages in the event that liability is established.

The Court is not persuaded that plaintiffs have adequately addressed the magnitude of the manageability problems presented herein. If the Court were to certify plaintiffs' national class as plaintiffs urge, the road to resolution of the matter's merits would be fraught with substantial obstacles at every turning: during discovery, during trial, and in the calculation of damages in particular. For instance, because GMAC does not maintain centralized personnel

files for job levels VII and below, it required 1,600 hours for defendant to comply with the Court's May 3, 1979 order to provide work histories for all GMAC employees, at only 23 branch offices, for the period July 1, 1972 to May 1, 1979. Although the Court is cognizant of the authority which finds error in the refusal to certify a class merely because of its size, e.g. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), the Court has serious reservations concerning plaintiffs' ability to effectively pursue discovery throughout all of defendant's hundreds of branch offices. Plaintiffs admit that there exists no centralized GMAC policy upon which the trial court can focus in coming to grips with the liability issues present here. Accordingly, such determinations would necessarily be made on the basis of the individualized review of thousands of hiring, promotion, and salary decisions at the branch office level. The benefits of class actions are undisputed, but where the device threatens to overwhelm both the judiciary, and perhaps counsel too, its merits pale.

Plaintiffs propose to address damages determinations through a "formula," or "modified formula" approach. Prior to *Franks v. Bowman Transportation,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), and *Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), a few decisions had lent support to the formula approach for calculating damages once a defendant was found guilty of a pattern of discrimination. However, in both *Franks* and *Teamsters,* in different factual settings, the court required individualized determinations of relief, in which the employer would be provided an opportunity to rebut each discriminatee's claim. In commenting on the obligations of the trial court in reaching such decisions, the *Teamsters* court noted:

> The task remaining for the District Court on remand will not be a simple one. Initially, the court will have to make a substantial number of individual determinations in deciding which of the minority employees were actual victims of the company's discriminatory practices. Af-

ter the victims have been identified, the court must, as nearly as possible, " 'recreate the conditions and relationships that would have been had there been no' " unlawful discrimination. *Franks,* 424 U.S. at 769 [96 S.Ct. at 1266] . . . .

> Moreover, after the victims have been identified and their rightful place determined, the District Court will again be faced with the delicate task of adjusting the remedial interests of discriminatees and the legitimate expectations of other employees innocent of any wrongdoing.

*Teamsters v. United States, supra,* at 371–72, 97 S.Ct. at 1872–1873. A number of courts, following *Franks* and *Teamsters,* have required the same approach to damage calculations in similar circumstances. *See, e.g., Mitchell v. Mid-Continent Spring Co.,* 583 F.2d 275 (6th Cir. 1978), *cert. denied,* 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 396 (1979); *Hill v. Western Electric Co.,* 596 F.2d 99 (4th Cir. 1979); *East Texas Motor Freight, supra; Clark v. Mann,* 562 F.2d 1104 (8th Cir. 1977); *Kyriazi v. Western Electric,* 465 F.Supp. 1141 (D.N.J.1979). In the wake of such decisions, we believe that it would be error to certify the instant proposed national class on plaintiffs' representations that they could manage their class through some sort of formula approach; not only are such methods almost fatally discredited, but the Court is not persuaded, from a reading of plaintiffs' papers, that such a formula could even be devised. Plaintiffs themselves have stated that they are doubtful that the case could be managed in an adversarial context. The Court is unwilling to impose on defendant the unusual obligation of managing it otherwise. Accordingly, the Court finds that the proposed national class would, in all likelihood, be unmanageable, and that certification could well prejudice potential class members who might better and more expeditiously redress their alleged injuries individually.

*Conclusion*

Plaintiffs' proposed national class is fraught with problems of insufficient com-

monality, elements of inadequate representation, and the spectre of prejudicial unmanageability.

It is accordingly ORDERED that plaintiffs' motion for class certification is DENIED.

The Clerk of this Court is instructed to send uncertified copies of this Order to all counsel of record and to United States Magistrate Philip K. Sweigert.